[Civ. No. 60200. Second Dist., Div. Five. May 19, 1981.]

CITY OF LOS ANGELES, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and
MORRIS RIVARD, Respondents.

COUNSEL

Burt Pines, City Attorney, H. John Wittorff, Assistant City Attorney, and Howard Fox, Deputy City Attorney, for Petitioner.

Jerome Harvey for Respondents.

OPINION

**STEPHENS, Acting P. J.**—Petitioner City of Los Angeles (City) contends that the Workers' Compensation Appeals Board (WCAB) has erred in finding that respondent Morris Rivard (hereinafter also applicant) sustained injury arising out of and occurring in the course of his employment. Applicant is employed by City as a police officer. Applicant has developed severe psychiatric problems as a consequence of the treatment of applicant by City police department in connection with an investigation of an alleged death threat by applicant against his spouse. For reasons stated herein, we hold that applicant's psychiatric condition is not compensable under the workers' compensation act.

I

Applicant began work for City as a police officer commencing in 1970. In 1971 applicant was assigned to the Van Nuys division of City's police department. Applicant and his wife were then having marital difficulties. Applicant's wife apparently would often call the police station during the day, harassing desk sergeants, lieutenants, and captains. Applicant was then relieved of his field duties and assigned to work in the station so that his wife's calls could be routed through his desk. Applicant was subsequently offered reassignment to either a traffic control unit or to the 77th division, both of which were considered to be undesirable assignments. Applicant believes that his wife's actions influenced his superiors into offering him the choice of undesirable duty.

Applicant eventually, but reluctantly, agreed to accept reassignment to the traffic control unit. Applicant, however, became discouraged in the traffic control unit. During 1973 he accepted reassignment to the 77th division. There he received outstanding ratings for job performance and even a commendation for entering a burning building to rescue an elderly man. Unfortunately, a series of injuries, both on and off the job, then affected his job performance. In March 1977, he was involved in an automobile accident while on duty, which resulted in his hospitalization.

Applicant returned to duty on July 1, 1977, but on July 9, 1977, he was involved in an off-duty traffic accident when a car made a U-turn and struck the motorcycle he was riding. The motorcycle accident resulted in severe injuries, a fractured skull, brain concussion, and a neck injury. He also developed, for a period of 10 days, an acute traumatic brain syndrome. Surgery was performed for an associated epidural hematoma. This hospitalization also managed to aggravate applicant's marital situation as the mother of applicant's wife, who worked at the hospital where applicant was being treated, reported to the wife that applicant had a positive venereal disease test; in reality the positive reading was false but this was not communicated to the wife until some time later.

Upon release from the hospital, applicant attempted a reconcilation with his spouse. This reconciliation, however, was short lived. One month after being discharged from the hospital applicant and his wife took up separate residences.

In October 1977 applicant returned to limited light duty with the 77th division.

On March 21, 1978, applicant voluntarily sought psychiatric help for his depression. The treating psychiatrist, Robert S. Hoffman, M.D., reports that at that time applicant's problems centered around his martial situation. Weekly psychiatric visits were arranged with Dr. Hoffman.

By this point, applicant's wife wanted a divorce. While applicant was also thinking about a divorce, he apparently was still seeking a reconcilation with her. On March 25, 1978, he went to visit her and their children, who were living with the wife. An argument ensued between applicant and his wife. Applicant pushed her and she fell. She then became hysterical and applicant slapped her cheek in a purported effort to calm her down. The local Ventura County Sheriff's Department was called. The wife made a citizen's arrest of applicant. Applicant was taken into custody and booked.

Applicant then returned to duty with the City police department. Sometime during early April 1978, an officer with whom applicant worked, Richard Platt, was leaving the station and had a conversation with applicant about his recent marital problems and the fact that he was taken into custody by the Ventura County Sheriff's Department. According to Platt, the conversation then "went something like [applicant] told me that he would be willing to pay somebody 15 hundred dollars to see that his wife was the 13th victim of the Hillside Strangler." Applicant then allegedly said to Platt "Do you need the money? I got the money." Platt, however, did not know whether applicant meant what he said. In Platt's view applicant might well have been serious or could well have been kidding. Platt reported this incident to his supervisor and the matter was referred to the police department internal affairs division.

Internal affairs then questioned applicant and confronted applicant with the allegation that he had solicited someone and conspired to kill his wife.[1] He was also questioned by the robbery-homicide division. Of-

---

[1]The nature of the alleged conspiracy was not well developed in the record. An independent medical examiner in psychiatry, Gary R. Davis, M.D., states in his report: "The conspiracy theory was linked to the fact that he had paid $2,000.00 to a colleague, Gary Crouch, a jailer, and the hypothesis [of the Police Department] was then that Gary was to be the 'hit man.'"

Applicant explains this payment to "Gary" as part of a real estate transaction in which Gary acted as the real estate agent.

ficers were sent out to applicant's wife to warn her of the threat against her life. Applicant's service revolver, a backup gun, and a .22-caliber rifle he kept at this residence were taken by the police department. Applicant's badge and I.D. card were not taken away from him. Upon leaving interrogation he tried to talk to his colleagues whom he worked with at the station, but no one would really speak with him. Applicant felt ostracized by his fellow officers.

Applicant was at his residence on April 6, 1978; he felt desperate, alone and suicidal. He called the 77th division in an attempt to get some support from his friends and colleagues. He also called Dr. Hoffman. The 77th division officers contacted officers from City's Van Nuys division, which was apparently closest to applicant's residence. While applicant was talking over the phone to Dr. Hoffman, his door bell rang. He opened the door to find two officers from the Van Nuys division with weapons drawn and pointed at him.

The officers wanted to take applicant to Olive View Hospital. The officers talked to Dr. Hoffman who was still on the phone; Dr. Hoffman wanted them to take applicant to Van Nuys Psychiatric Hospital where Dr. Hoffman had staff privileges. Two sergeants from the 77th division then arrived and took applicant to Van Nuys Psychiatric Hospital. Applicant was hospitalized for 10 months when he was discharged because his health insurance carrier refused to pay for further psychiatric care. Since discharge from the hospital, applicant continued under the psychiatric care of Dr. Hoffman.

Applicant steadfastly maintains that he did not solicit anyone, including Officer Platt, to kill his wife and did not enter into any conspiracy to kill her. Applicant has not been formally charged in connection with the alleged conspiracy and/or solicitation to commit murder. He also has not been terminated from the police department.

Dr. Hoffman is of the opinion that applicant suffers from a "reactive depression of neurotic proportions." Dr. Hoffman believes that critical to the development of applicant's psychiatric problems was the treatment applicant received at the hands of the police department in connection with the charges of solicitation and conspiracy to commit the murder of his wife.[2] The independent medical examiner in psychia-

---

[2]Dr. Hoffman stated in pertinent part in his report of August 8, 1978:

"ASSESSMENT: This patient is suffering from a reactive depression of neurotic proportions. The initial dynamics involved the failure of his marriage and his insight into

try, Gary R. Davis, M.D., is similarly of the opinion that applicant's present psychiatric problems stem in crucial part from his reaction to his treatment by the police department.[3]

---

his deficits as a husband and father. However, his acute crisis with suicidal despair, which required hospitalization, resulted from an acute exacerbation of the depression relating to his divorce, resulting from interactions between the patient and the district attorney and judge involved in his arrest [by his wife for assault and battery in March 1978], and most of all, his interactions with the Los Angeles Police Department....

"This patient, with a long history of impoverishment as a child, was essentially parented by institutions (first a children's home, later the Marine Corps, and finally the Police Department). The Los Angeles Police Department became his family and the source of his identity. He defined his life in terms of his work. His subsequent confrontation with the reality that the Los Angeles Police Department is neither a 'good' parent nor a parent at all, led to serious decompensation in his functioning and significant exacerbation of his depression....

"DYNAMIC SUMMARY

"In conclusion, the patient has survived a devastating series of traumas, beginning in infancy and continuing through to the present. One of the techniques he has utilized in order to survive is 'identification with the aggressors' in his life, by becoming a 'good boy,' a 'good soldier,' and a 'good cop.' Having adopted the strict, moralistic values with which he was raised, and having been raised in an institution, he looked to a series of institutions for a sense of belonging and self-worth. Socially naive and inept, he married the already divorced woman who taught him about sex, but he never felt he belonged home with his wife and children. Unable to relate comfortably as a husband or father, he invested his time, energy and feelings in his work as a 'protector' of the 'civilians' involved in a virtuous mission. He risked his life for his companions, whom he considered as 'brothers,' and performed for the 'Department,' his version of parental authority. He did not trust the civilian world, and only felt at home as a policeman, looking to the Department for caring, companionship, belonging and protection. Even when he was repeatedly injured sufficiently to qualify for medical retirement, he returned to his work on the streets, vigorously eschewing all alternatives. In addition, although he did become depressed, he endured the trials and tribulations of his turbulent, eventually disintegrating symbiotic marriage. In fact, he sought help, entered therapy and began to demonstrate growth despite the trauma of his arrest, until the Los Angeles Police Department began to treat him 'like a criminal,' casting him out of the fold. Feeling abandoned and betrayed, he decompensated and became desperate and suicidal, necessitating hospitalization. Although he has recovered from the immediate crisis which precipitated admission, he remains depressed, homeless, and jobless. He is ambivalent about his future, feeling frightened to leave the Los Angeles Police Department, but equally frightened to return to what he is convinced will be harassment, self-doubt, and constant paranoia."

[3]Dr. Davis stated in pertinent part in his report of March 30, 1979:

"DIAGNOSIS:

"Depressive Neurosis. I find very little to disagree with in the excellent reports submitted by Dr. Hoffman. I think he has done a masterful job in describing the case and in discussing the psychodynamics....

"I am, however, dissatisfied with the precision and accuracy of the diagnosis 'Depressive Neurosis.' It is unfortunately the 'official' diagnosis (in DSM II) that most closely fits the clinical picture, though it is still off the mark.

"I make a distinction between 'self-esteem' and 'self-integrity'. Loss of self-esteem is

## II

In finding a compensable industrial injury, the workers' compensation judge stated in his opinion on findings:

".... The only factual dispute herein is whether in fact applicant ever solicited a fellow officer to murder his wife for a sum of money. Applicant denied that he ever did same, while a witness testified that in fact he did so solicit an officer. However, this case turns on the narrow issue of the undisputed fact that the Internal Affairs Division of the Los Angeles Police Department conducted an internal investigation of the alleged incident. The manner of conducting the investigation as well as the method of conducting the investigation, together with the fact that the investigation was taking place all combined to produce a serious and significant adverse reaction on the part of the applicant. This adverse

---

most associated with depression. That is, depression involves a sense of weakness and lack of energy with which to pursue productive activity. Loss of self-integrity in comparison is most associated with impaired ability to think clearly, with a sense of bewilderment and befuddlement, and confusion and chaos and psychic disorganization.

"I think it is more the latter psychic injury that occurred to [applicant]. That is the devastating (to him) experience of thinking that one belongs to and is part of a revered institution and suddenly finding oneself alienated from that institution and 'thrown into a vacuum' and being persecuted by it makes for a severe disorganizing and befuddling effect upon the ego.

"Further, like a scene in a Franz Kaffa story, allegations that are unclearly stated, unstated, not familiar, and do not fit with what one observes of the reality about him also have a befuddling disorganizing effect upon the mind and make it very difficult to function mentally. One's mind feels disintegrated, scattered and damaged in such circumstances. That is different qualitatively and more devastating quantitatively than the unpleasant empty, weak psychic feeling that characterizes depression. To be sure, a loss of self-esteem secondarily accompanies a loss of self-integrity. With an apt metaphor, like a cracked ('crazed,' 'crazy') vessel, a disintegrated ego cannot hold self-esteem.

"The subjective experience that [applicant] had, I believe, is like being 'crazy' without actually being crazy. That is, being aware that the experience is disorganizing and disintegrating and being aware of one's sense of disorganization.

"[Applicant's] whole life has been essentially a succession of institutions to which he belonged. From the orphan home to the school to the Marine Corps to the LAPD, and currently to the Van Nuys Psychiatric Hospital. Being a member identified with a large stable institution has been a very important element in maintaining [applicant's] sense of self-integrity. His identification with the LAPD was the central anchor in his life. The LAPD was his family. When he was accused by the LAPD of something over which he had no knowledge and when he was suspended from duty, it was as if his family had tried to kill him, as if his whole existence caved in.

"In addition the depressive element of his illness consists of feeling injured, deprived and negated. He lost something that not only gave him a sense of integrity but also pleasurable experiences from which he drew satisfaction and pride and feelings of well-being. His work with LAPD was not only his source of self-integrity, it was also his source of self-esteem. He lost a great deal of both in the act of being accused and investigated by the Police Department."

reaction can be described in lay terminology as a 'nervous breakdown' necessitating 10 months in a psychiatric institution.

"The applicant's unrebutted testimony as to the effect that the investigation caught him totally off guard, was conducted in a manner wherein he was abruptly charged with soliciting an officer to kill his wife and questioned with regard to the same over an extended period of time. This took place on his day off.

"Although the Trial Judge is not questioning the fact that an internal affairs investigation should have been performed and was in fact performed according to police guidelines, it is apparent that at the very least, the investigation was performed abruptly and insensitively without regard to the profound impact that the investigation would have on the applicant. There is no medical dispute that the effect resulted in psychiatric problems both as to need for treatment and as to disability. This is substantiated by the medical opinion of Gary R. Davis, M.D., with regard to both his report as an Independent Medical Examiner dated March 30, 1979, and also his actual testimony at the hearing of August 20, 1979. There is also no dispute that applicant had other problems that were and are contributing to his overall disability; namely, marital problems and problems resulting from the non-industrial motorcycle accident. However, these problems are to be considered with regard to apportionment."

In further support of his decision, the workers' compensation judge stated in pertinent part in his report and recommendation upon defendant's [City's] petition for reconsideration:

". . . [City's] entire argument rests upon the assumption that applicant was guilty of some illegal act. Not only had the applicant not been charged with any illegal act, but [City] specifically and intentionally presented no evidence at the trial whatsoever as to the Internal Affairs investigation, the manner, method and mode of conducting same, nor did they present any of the participants from the Los Angeles Police Department who in fact conducted said investigation. Therefore, the trial judge's sole evidence of the investigation procedure was solely through the eyes of the applicant. [City] must bear some responsibility for making an intentional decision not to present any evidence whatsoever as to the Internal Affairs investigation. Therefore, applicant's testimony was in effect unrebutted. In fact at the hearing of April 21, 1980, the applicant testified that he has not heard the results of the In-

ternal Affairs investigation. He also has testified that he has never been discharged from the Los Angeles Police Department and still has his badge and identification card.... [¶] The trial judge was thereupon in a position to evaluate the testimony of the applicant plus two witnesses called by [City] as well as weighing and evaluating the medical opinion of [the] psychiatrists.... Said medical and lay witnesses [are] substantial and compelling and support the decision herein."

Relying upon the judge's analysis, the WCAB denied reconsideration. City then petitioned this court for a writ of review, which we granted.

## III

There is no doubt that applicant's psychiatric problems stem in significant part from his reaction to the accusation, investigation, and handling by the police department of the charge that applicant solicited someone to kill his wife and/or entered into a conspiracy to do so.

The sole question of law presented herein is whether applicant's psychiatric condition arose out of and occurred in the course of employment. That is, whether applicant's psychiatric condition is compensable under the Workers' Compensation Act.

Recently in *Pacific Tel. & Tel. Co.* v. *Workers' Comp. Appeals Bd.* (1980) 112 Cal.App.3d 241 [169 Cal.Rptr. 285], we were called upon to decide the compensability under the Workers' Compensation Act of a psychiatric injury sustained by an advertising salesperson as the result of both the stress from an accusation by his employer (Pacific Telephone) that he had forged customer signatures on advertising contracts and the stress from the subsequent investigation by the employer of that accusation and the termination of his employment.

"We deem[ed] it beyond dispute that if [the employee] had not forged any signatures that any injury to his emotional state would be compensable under the Workers' Compensation Act. This would be true even assuming Pacific Telephone had acted reasonably and properly in its accusation, investigation and discharge of [the employee]; the resulting psychiatric conditions would be concerned with [the employee's] underlying legitimate conduct (entering into advertising contracts with customers) which, in fact, had been in the course of his employment. Negligence by the employer is not a condition of compensability under the Workers' Compensation Act. (Lab. Code, § 3600, subd. (c).)" (*Pa-*

cific Tel. & Tel. Co. v. Workers' Comp. Appeals Bd., supra, 112 Cal. App.3d at pp. 244-245.)

We could not, however, "conceive of a realistic argument that [the employee] would be directly or indirectly serving his employer by the forging of contract signatures. Accordingly, [we held that any] injury sustained during the actual furtherance of the criminal activity of forgery would not be compensable." (Pacific Tel. & Tel. Co., supra, 112 Cal.App.3d at p. 246.) Noting that there "the claimed industrial injury was not sustained directly during the course of the alleged criminal activity but sustained as a consequence of the accusation, investigation and termination of [the employee]," we further held that if the employee "in fact engaged in the criminal activity of forgery, his injury [as a consequence of the employer's accusation, investigation and discharge of him] cannot be held compensable under the Workers' Compensation Act, as his injury would not be a consequence of his employment but incidental to his criminal conduct." (Pacific Tel. & Tel. Co., supra, 112 Cal.App.3d at pp. 246-247.)

Remanding the matter to the WCAB, we directed that the burden of proof was upon Pacific Telephone "to establish by a perponderance of the evidence (see Witkin, Cal. Evidence (2d ed. 1966) Burden of Proof and Presumptions, § 208, pp. 189-190) every element of the criminal activity of forgery. (Evid. Code, § 520; see Ross v. Workmen's Comp. Appeals Bd. (1971) 21 Cal.App.3d 949, 955 [99 Cal.Rptr. 79].)" (Pacific Tel. & Tel. Co., supra, 112 Cal.App.3d at p. 247.) We cautioned "All reasonable doubts, however, are to be resolved in favor of [the employee]. (Lab. Code, § 3202; Ross, supra, at p. 955.)" (Pacific Tel. & Tel. Co., supra, at p. 247.)

If the present matter were identical to Pacific Tel. & Tel. Co. our task would be simple; we would only need to remand the matter to the WCAB, as we did in Pacific Tel. & Tel. Co., with directions to make a specific finding on whether applicant had in fact engaged in any criminal activity. There is present here, however, a decidedly different fact from the situation in Pacific Tel. & Tel. Co. There the allegation of criminal activity concerned the employee's job activities. If the employee had indeed not forged any contracts signatures, then the activity for which he was investigated by the employer would in reality have been legitimate activity in the course of his employment duties. Here, however, the underlying activity for which the police department investigated

applicant was unconnected with his duties within the course of his employment, but related to his personal marital problems.

■ In our view a police officer who is accused of criminal activity *which pertains to matters outside of his functioning as a police officer* is in no different a position from any private citizen accused of criminal activity. In the event such accusations should prove to be false, his rights should be no greater than any to which the ordinary private citizen is entitled since such accusation dealt not with his actions in the capacity of a police officer but in the capacity of a private citizen.[4]

Thus, we hold that applicant's injury herein is not compensable under the Workers' Compensation Act if his psychiatric condition is the sole consequence of the police department's accusation and investigation of his alleged criminal activities in his capacity as a private citizen and of other nonwork related factors. The medical record, however, reveals that the situation herein may well be more complicated.

As Dr. Hoffman (*ante*, fn. 2) and Dr. Davis (*ante*, fn. 3) point out, the psychodynamics of applicant's emotional problems are intertwined with the fact that applicant's position with the police department was the source of applicant's "self-integrity" and the "central anchor of his life."

In accord with our decision in *Pacific Tel. & Tel. Co.,* if as a result of the stress and strain of applicant's employment or other type of job injury applicant developed a psychiatric disorder or other emotional problem which in turn resulted in applicant making the alleged threats against his wife, then quite clearly there would be a compensable industrial injury. (*Pacific Tel. & Tel. Co., supra,* 112 Cal.App.3d at pp. 247-248.) Similarly, if the nature of applicant's employment, outside of the departmental investigation of the criminal charges concerning his wife, contributed or made him more vulnerable to the current emotional difficulties then there would also be compensable industrial injury. After all, such employment connection (outside of the investigation) need only have been a *contributing* cause to the emotional problem in order for there to be an industrial injury. (See *Lamb* v.

---

[4]In contrast, a police officer accused of engaging in a criminal activity in the course of his duties as a police officer would be governed by the principles set forth in *Pacific Tel. & Tel. Co.*

We also do not deal with a situation where injury has resulted from attempts by the employer to regulate an employee's noncriminal outside activities. (See *City of Fresno* v. *WCAB* (*Burks*) (1980) 45 Cal.Comp.Cases 812.)

*Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 281 [113 Cal. Rptr. 162, 520 P.2d 978]; *Hart* v. *Workers' Comp. Appeals Bd.* (1978) 82 Cal.App.3d 619, 627 [147 Cal.Rptr. 384].)

Accordingly, further consideration of the compensability of applicant's workers' compensation claim needs to be done by the WCAB. The WCAB's finding that applicant sustained injury arising out of and occurring in the course of his employment is annulled and the matter is remanded to the WCAB for reconsideration and such further proceedings as are consistent with our opinion.

Ashby, J. and Hastings, J., concurred.