[No. S017174. May 18, 1992.]

APOSTOL LIVITSANOS, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CONTINENTAL CULTURE SPECIALISTS, INC., et al., Real Parties in
Interest.

**COUNSEL**

Grossman, Grant, Cowan & Cramer, Michael I. Cowan and D. Toby Tabachnick for Petitioner.

Joseph Posner as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Carr & DeMarzo, Marshall, Carr & Perrigue and Christopher A. Carr for Real Parties in Interest.

## OPINION

**ARABIAN, J.**—We granted review to consider whether the exclusive remedy provisions of the Workers' Compensation Act apply to bar an employee's claims for intentional and negligent infliction of emotional distress, where no physical injury or disability is alleged. We hold that claims for intentional or negligent infliction of emotional distress are preempted by the exclusivity provisions of the workers' compensation law, notwithstanding the absence of any compensable physical disability. We further conclude that, for unrelated reasons, the case must be remanded to the Court of Appeal for further proceedings consistent with the views set herein.

### FACTS

Because the matter reaches us after the sustaining of a demurrer, all well-pleaded allegations of the complaint are taken as true. (*Ephraim* v. *Metropolitan Trust Co.* (1946) 28 Cal.2d 824, 838 [172 P.2d 501]; see *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 663 [254 Cal.Rptr. 211, 765 P.2d 373]; *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839, 610 P.2d 1330].)

Plaintiff Apostol Livitsanos began his employment at Continental Culture Specialists, Inc. (Continental), a yogurt manufacturing company owned by Vasa Cubaleski (Cubaleski), in 1976 in the shipping department. Two years later, plaintiff was promoted to supervisor of the department and in 1980 he was made manager, with attendant salary increases. Plaintiff alleges that, as an inducement to remain at Continental, an oral employment agreement with Continental included a provision, repeated by defendant Cubaleski on many occasions to plaintiff and other employees, that "Continental is your future" as long as plaintiff followed proper procedures, and that "if Continental makes money, so will you." Plaintiff believed his employment was of indefinite duration, and would not be terminated without good cause.

In 1982, plaintiff was promoted to general manager and received a 1.25 percent share of Continental's gross sales in addition to an increased salary. As general manager, plaintiff worked sixteen hours a day on weekdays and three or four hours a day on weekends. In 1987, Continental introduced an employee profit-sharing plan as an inducement to employees to remain with the company. Pursuant to the plan, plaintiff was entitled to receive a share of Continental's profits so long as he was an employee.

In 1984, Continental's regular distributor went out of business, leaving Continental without a distributor. Plaintiff and another Continental employee, Andy Stylianou, formed a company, known as ABA, exclusively to

distribute Continental's products. Plaintiff and Stylianou operated the distributorship with full knowledge and approval of defendants Continental and Cubaleski.

Throughout plaintiff's term of employment, defendant Cubaleski praised plaintiff's performance, telling him that he had "saved the company," and that he would "someday own Continental."

In late 1988 or early 1989, for no apparent reason, Cubaleski began a campaign of harassment against plaintiff. This campaign took several forms. Cubaleski falsely accused plaintiff, along with Continental's office manager, of writing fraudulent checks to an outside contractor as part of a scheme to siphon funds away from Continental. Cubaleski communicated this charge to other Continental employees, as well as to an employee of an outside accounting firm. In addition, Cubaleski told Continental employees and others that $800,000 was "missing" from Continental, implying that plaintiff had stolen the money. Cubaleski threatened to have plaintiff "put in jail" because of the "missing" money.

In December 1988, Cubaleski borrowed $100,000 from plaintiff and promised to repay the entire amount by January 9, 1989. By March 15, 1989, Cubaleski still had not repaid plaintiff. When plaintiff asked Cubaleski for the money, Cubaleski became angry. Instead of repaying the loan, Cubaleski falsely told others that plaintiff owed him $24,000. Cubaleski knew there was no such debt owed to him by plaintiff. Cubaleski eventually repaid the $100,000 debt by paying $50,000 to plaintiff and by assuming a $50,000 debt plaintiff owed to Continental.

In or about April 1989, plaintiff took a four-week vacation. While plaintiff was on vacation, Cubaleski told other Continental employees that plaintiff had given himself an unauthorized pay raise, that money was missing from Continental (implying that plaintiff had stolen it), and that plaintiff was trying to sabotage Continental by telling certain employees to decrease the amount of fruit in the yogurt. When plaintiff returned, Cubaleski instructed Andy Stylianou, Continental's sales manager, to telephone plaintiff and accuse him of taking an unauthorized pay raise and sabotaging Continental.

In August 1989, Cubaleski insisted that plaintiff and Stylianou sell their distributorship company, ABA, to another distributor that Continental wished to employ. At the time, one of the clients of ABA was indebted to the company because Continental had asked ABA to extend $100,000 credit to this customer. Cubaleski promised that, if plaintiff sold ABA, Continental would assume responsibility for the $100,000 credit. After plaintiff agreed to

sell ABA, Cubaleski demanded that plaintiff sign a promissory note for the $100,000 credit and agree to personal liability or he would "be in trouble." Plaintiff signed the note. Approximately two weeks later, plaintiff was terminated.

Plaintiff was discharged with no warning, no explanation and no severance pay. After the termination, Cubaleski told other Continental employees that plaintiff's company had been improperly buying fruit toppings to resell, using Continental's money. The accusations were false. After the termination, Cubaleski also told other Continental employees that plaintiff had stolen $800,000 from Continental and that plaintiff was blackmailing Cubaleski.

Plaintiff filed suit against Continental and Cubaleski for breach of contract, defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, and money lent.[1] He alleged that defendants engaged in a campaign of harassment resulting in the wrongful termination of his employment. Defendants demurred to the causes of action for defamation and negligent and intentional infliction of emotional distress.[2] The trial court sustained Continental's demurrers without leave to amend, apparently on the ground that the employer's conduct was "a normal part of the employment relationship" and therefore barred by the Workers' Compensation Act (*Cole* v. *Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 160 [233 Cal.Rptr. 308, 729 P.2d 743] (hereafter *Cole*). Cubaleski's demurrers were also sustained, but leave to amend was granted as to limited issues. The Court of Appeal, citing *Cole*, *supra*, 43 Cal.3d 148, summarily denied plaintiff's petition for writ of mandate.

DISCUSSION

### 1. *Intentional Infliction of Emotional Distress*[3]

Plaintiff contends that because he did not allege any physical injury or disability resulting from defendants' conduct, his cause of action for

---

[1]The first cause of action, for breach of contract, was alleged against defendant Continental only. The fifth cause of action, for money lent, was against Cubaleski only. The remaining causes of action were alleged against both defendants.

[2]Continental did not demur to the first cause of action for breach of contract. Cubaleski's demurrer to the fifth cause of action (money lent) was overruled. These causes of action are not at issue.

[3]The causes of action for intentional and negligent infliction of emotional distress, unlike the cause of action for defamation, were not clearly focused on particular acts. Rather, the claim for intentional infliction of emotional distress reincorporated all the previous allegations and alleged "[a]s a proximate result of the aforementioned outrageous acts, including but not limited to the campaign of harassment and intimidation, the spreading of false statements in an attempt to defile [plaintiff's] character to co-employees and others, and the other above-alleged rude and degrading treatment, plaintiff has suffered severe humilia-

intentional infliction of emotional distress is outside the scope of the workers' compensation law, and thus not governed by *Cole, supra,* 43 Cal.3d 148. He relies principally on *Renteria* v. *County of Orange* (1978) 82 Cal.App.3d 833, 838 [147 Cal.Rptr. 447] (hereafter *Renteria*), which held that a cause of action for intentional infliction of emotional distress is outside the scope of the workers' compensation scheme where the injury is purely "emotional," and no "physical" disability is alleged.

We have not heretofore been called upon to reconcile the principles of *Cole* and *Renteria.* In *Cole,* the employer engaged in a campaign of harassment which caused the plaintiff severe physical injury and disability. We held that the injuries were compensable under workers' compensation notwithstanding the egregious nature of the employer's misconduct, because such actions "are a normal part of the employment relationship." (43 Cal.3d at p. 160.) There was no allegation, however, that the plaintiff had suffered a "purely emotional" injury. (*Id.* at p. 153.) Although we took note of certain problems posed by the reasoning in *Renteria, supra,* 82 Cal.App.3d 833, we did not address them. (43 Cal.3d at p. 156.) Subsequently, in *Shoemaker* v. *Myers* (1990) 52 Cal.3d 1 [276 Cal.Rptr. 303, 801 P.2d 1054, A.L.R.4th 1720], and *Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083 [4 Cal.Rptr.2d 874, 824 P.2d 680], we considered the relation between workers' compensation and an injured employee's civil damage claims, but because both of the plaintiffs there alleged mental and physical disability, we were not required to address the so-called *Renteria* "anomaly." (*Cole, supra,* 43 Cal.3d at p. 156.) ▪▪▪ ▪ Here, plaintiff has not alleged any physical injury or disability resulting from the employer's conduct.[4] Thus, for the first time, we are called upon to construe the principles we adduced in *Cole* in the context of a case of purely emotional injury.

We begin with a review of *Renteria, supra,* 82 Cal.App.3d 833. The plaintiff filed a civil action against his employer and fellow employees

---

tion, aggravation, mental anguish, and emotional distress . . . ." Plaintiff alleged the defendants' acts were intentional and in conscious disregard of plaintiff's rights so as to justify punitive damages.

The cause of action for negligent infliction of emotional distress alleged that defendants breached a duty of due care not to cause emotional distress to plaintiff and that defendants knew or should have known their actions would cause plaintiff to suffer severe emotional distress. Again, plaintiff alleged the misconduct was intended to cause injury and was committed in wilful, conscious disregard of plaintiff's rights, justifying an award of punitive damages.

[4]We reject defendants' suggestion that allegations plaintiff suffered "nervousness" necessarily constitute physical injury. Terms such as nervousness, anxiety, worry, humiliation, embarrassment, apprehension, and others, refer to subjective emotional states. (*Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892-893 [103 Cal.Rptr. 856, 500 P.2d 880].)

alleging numerous acts of harassment designed to discriminate against him because of his Mexican-American ancestry. The defendants successfully demurred on the ground the action was barred by the exclusive remedy provisions of the workers' compensation law. The Court of Appeal reversed, holding that the cause of action for intentional infliction of emotional distress was not barred.[5]

The court first rejected the defendants' claim that emotional distress damages are generally recoverable in a workers' compensation proceeding. Although physical injury (e.g., a heart condition) caused by mental and emotional stress, or disabling mental illness caused by job pressures are compensable, the court held that "mental suffering, *as such*," without accompanying physical injury or disability, was not a compensable injury. (*Renteria, supra*, 82 Cal.App.3d 833, 839; italics in original.) The court noted that the fact that an injury was noncompensable did not, "by itself, abrogate the exclusive remedy provisions of the Workers' Compensation Act." (*Id.* at p. 840.) It determined, however, that the plaintiff's action was "not an isolated instance of a physical injury which is noncompensable, but an entire class of civil wrongs outside the contemplation of the workers' compensation system. [Citation.]" (*Id.* at p. 841.)

It reached this conclusion, evidently, in large part because the alleged wrong involved intentional injury. As the court stated: "While it is possible to believe that the Legislature intended that employees lose their right to compensation for certain forms of negligently or accidentally inflicted physical injuries in exchange for a system of workers' compensation featuring liability without fault, compulsory insurance, and prompt medical care, it is much more difficult to believe that the Legislature intended the employee to surrender all right to any form of compensation for mental suffering caused by extreme and outrageous misconduct by an employer." (*Renteria, supra*, 82 Cal.App.3d 833, 841.)

The *Renteria* court therefore concluded that the cause of action for intentional infliction of emotional distress constituted an implied exception to workers' compensation exclusivity under conditions where the " 'essence of the tort, in law, [was] non-physical . . . .' " (*Renteria, supra*, 82 Cal.App.3d 833, 842.)

In many respects the *Renteria* opinion (*supra*, 82 Cal.App.3d 833) is instructive; for example, the notion that certain wrongs lie wholly outside the

---

[5]Although the plaintiff in *Renteria* alleged several theories in his complaint, the only cause of action discussed by the Court of Appeal was that for intentional infliction of emotional distress.

contemplation of the workers' compensation scheme presaged our holding in *Gantt* v. *Sentry Insurance, supra,* 1 Cal.4th 1083, concerning claims for discharge in contravention of fundamental public policy. (See *Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d 162.) However, the analysis was also in several respects fatally flawed.

■ In the first place, the proposition that intentional or egregious employer conduct is necessarily outside the scope of the workers' compensation scheme is erroneous. This was the precise problem which we addressed in *Cole, supra,* 43 Cal.3d 148, where we noted that many intentional acts by an employer could be expected to cause emotional distress and yet do not lie outside the proper scope of workers' compensation. Even intentional "misconduct" may constitute a "normal part of the employment relationship." (*Id.* at p. 160.) As we subsequently observed in *Shoemaker* v. *Myers, supra,* 52 Cal.3d 1, "Even if such conduct may be characterized as intentional, unfair or outrageous, it is nevertheless covered by the workers' compensation exclusivity provisions." (*Id.* at p. 25.)

Furthermore, as we observed in *Cole, supra,* 43 Cal.3d 148 at page 156, the *Renteria* court's distinction between "physical" and "emotional" injury presents a glaring anomaly: If the employer's misconduct causes "purely emotional" distress, then the employee may maintain a civil action with full tort remedies; if the employer's conduct is so outrageous as to cause actual physical disability, however, the employee is limited to the recovery of workers' compensation. Thus, the more reprehensible the employer's conduct, the more likely that such conduct would be shielded by the workers' compensation exclusivity rule. It would then be in the employer's best interest to make conditions so intolerable for an employee and to cause such a level of emotional distress that the employee could not work as a result. Thus, the employer could avoid civil liability for the most egregious misconduct. (*Meninga* v. *Raley's, Inc.* (1989) 216 Cal.App.3d 79, 89 [264 Cal.Rptr. 319].)

Clearly, the law should not, and need not, countenance such paradoxical results. The "physical" versus "emotional" dichotomy is logically insupportable. More importantly, it is contrary to the text and purposes of the workers' compensation law.

■ The touchstone of the workers' compensation system is industrial injury which results in *occupational disability* or death. (*Shoemaker* v. *Myers, supra,* 52 Cal.3d 1, 16; *Union Iron Wks.* v. *Industrial Acc. Com.* (1922) 190 Cal. 33, 39 [210 P. 410].) Labor Code section 3208 defines "injury" as "*any* injury or disease arising out of the employment . . . ." (Italics added.)

Labor Code section 3208.1 describes "specific" injuries "occurring as the result of one incident or exposure *which causes disability or need for medical treatment*" and "cumulative" injury as "occurring as repetitive mentally or physically traumatic activities extending over a period of time, the combined effect of which *causes any disability or need for medical treatment*." (Italics added.) Thus, as the court in *Coca-Cola Bottling Co.* v. *Superior Court* (1991) 233 Cal.App.3d 1273 [285 Cal.Rptr. 183], observed, "a compensable injury is one which causes disability or need for medical treatments." (*Id.* at p. 1284.)

■   Moreover, the workers' compensation system is designed to compensate *only* for such disability or need for treatment as is occupationally related. "Temporary disability" benefits are a substitute for lost wages during a period of temporary incapacity from working; "permanent disability" payments are provided for permanent bodily impairment, to indemnify for impaired future earning capacity or decreased ability to compete in an open labor market. (*Russell* v. *Bankers Life Co.* (1975) 46 Cal.App.3d 405 [120 Cal.Rptr. 627]; see Lab. Code, § 4660, subd. (a).) The basic purpose of the Workers' Compensation Act is to compensate for the disabled worker's diminished ability to compete in the open labor market, not to compensate every work-related injury. (*Mercier* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 711, 716 [129 Cal.Rptr. 161, 548 P.2d 361].)

■   Thus, compensable injuries may be physical, emotional or both, so long as they are disabling. (See *Hart* v. *National Mortgage & Land Co.* (1987) 189 Cal.App.3d 1420, 1428-1430 [235 Cal.Rptr. 68] [rejecting the " 'physical versus emotional harm' " test, but finding multiple acts of offensive touching were not a risk incident to or a normal part of the employment relationship].) Recognition of compensable psychiatric injury is contained, for example, in Labor Code sections 3209.3, 3209.7, and 3209.8, which expressly permit "therapy" as a compensable means of treatment, and define licensed psychologists and counselors as qualified providers of treatment. Labor Code section 3208.3, added by Statutes 1989, chapter 892, section 25, presently provides that a psychiatric injury "shall be compensable if it is a mental disorder which causes disability or need for medical treatment" and it is diagnosed under prescribed criteria. (Lab. Code, § 3208.3, subd. (a).) "In order to establish that a psychiatric injury is compensable, an employee shall demonstrate by a preponderance of the evidence that actual events of employment were responsible for at least 10 percent of the total causation from all sources contributing to the psychiatric injury." (Lab. Code, § 3208.3, subd. (b).)

Compensation for psychiatric injury is not new; rather, in enacting Labor Code section 3208.3, the Legislature intended simply to require a higher

threshold of compensability for psychiatric injury. (Lab. Code, § 3208.3, subd. (c).) An employee who suffers a disabling emotional injury caused by the employment is entitled, upon appropriate proof, to workers' compensation benefits, including any necessary disability compensation or medical or hospital benefits. (See, e.g., *Albertson's, Inc.* v. *Workers' Comp. Appeals Bd.* (1982) 131 Cal.App.3d 308, 313-314 [182 Cal.Rptr. 304]; *City of Los Angeles* v. *Workers' Comp. Appeals Bd.* (1981) 119 Cal.App.3d 355, 365-366 [174 Cal.Rptr. 25]; see also *Pichon* v. *Pacific Gas & Electric Co.* (1989) 212 Cal.App.3d 488, 496-498 [260 Cal.Rptr. 677].)

Thus, the *Renteria* court plainly erred in suggesting that emotional injury which results in an industrial disability is not compensable under the Workers' Compensation Act. So long as the basic conditions of compensation are otherwise satisfied (Lab. Code, § 3600), and the employer's conduct neither contravenes fundamental public policy (*Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d 167) nor exceeds the risks inherent in the employment relationship (*Cole, supra,* 43 Cal.3d 148), an employee's emotional distress injuries are subsumed under the exclusive remedy provisions of workers' compensation.

The conclusion that emotional injury lies within the scope of the workers' compensation law does not complete the analysis, however. For injury must also result in an industrial *disability* compensable under workers' compensation. (Lab. Code, § 3208.1; *Coca-Cola Bottling Co.* v. *Superior Court, supra,* 233 Cal.App.3d at p. 1284.) ■ It is theoretically possible to incur a work-related injury that results in no compensable industrial disability. Indeed, this was one of the concerns originally addressed in *Renteria.* And *Renteria* itself contains the answer: "The existence of a noncompensable injury does not, by itself, abrogate the exclusive remedy provisions of the Workers' Compensation Act." (82 Cal.App.3d at p. 840.)

This proposition was more fully explained by the court in *Williams* v. *State Compensation Ins. Fund* (1975) 50 Cal.App.3d 116, [123 Cal.Rptr. 812], where an employee who allegedly suffered a loss of sexual function as the result of an industrial injury asserted that his civil claim should go forward because such losses were not compensable under workers' compensation. The court rejected the argument, explaining as follows: "Plaintiff is correct in arguing that the statutory emphasis on *occupational* disability as a rating factor denigrates the compensability of nonoccupational handicaps. Decisions in other states hold that the workers' compensation law provides the exclusive remedy for industrial injury even though the resulting disability— for example, sexual impotence—is noncompensable. (See cases cited, 2 Larson, Workmen's Compensation Law, § 65.20.) . . . The theory underlying the out-of-state decisions is that the workers' compensation plan imposes

reciprocal concessions upon employer and employee alike, withdrawing from each certain rights and defenses available at common law; the employer assumes liability without fault, receiving relief from some elements of damage available at common law; the employee gains relatively unconditional protection for impairment of his earning capacity, surrendering his common law right to elements of damage unrelated to earning capacity; the work-connected injury engenders a single remedy against the employer, exclusively cognizable by the compensation agency and not divisible into separate elements of damage available from separate tribunals; *a failure of the compensation law to include some elements of damage recoverable at common law is a legislative and not a judicial problem.* [Citations.]" (*Id.* at p. 122, italics added.)[6]

In sum, where the employee suffers annoyance or upset on account of the employer's conduct but is not disabled, does not require medical care, and the employer's conduct neither contravenes fundamental public policy nor exceeds the inherent risks of the employment, the injury will simply not have resulted in any occupational impairment compensable under the workers' compensation law or remediable by way of a civil action. To be sure, the theoretical class of cases which fit these criteria, in which there will be *no* remedy, would appear to be rather limited. Nevertheless, the possibility of a lack of a remedy in a few cases does not abrogate workers' compensation exclusivity. Not every aggravation in normal employment life is compensable.[7]

■ The question remains whether, in light of the foregoing principles, the demurrers to plaintiff's causes of action for intentional and negligent

---

[6]It should be noted that the portion of *Williams* v. *State Compensation Ins. Fund, supra,* 50 Cal.App.3d 116, discussed in *Renteria, supra,* 82 Cal.App.3d 833, 840-841, apparently dealt with the question of rating factors with respect to an award of *permanent* disability benefits. An employee who suffered injury to the groin and thigh area from a machine used at work might well require medical treatment for the injuries and temporary disability benefits while off work. The employee would of course be entitled to such benefits, whether or not there was ultimately any residual ratable "permanent" disability. In addition, as the *Williams* court noted, Labor Code section 4660 provides that disfigurement, as well as occupational handicap, is a basis for an award of permanent disability. The court stated that "Whether disfigurement in the statutory sense requires visible mutilation or, on the contrary, comprehends a functional impairment without external manifestations, is an open question in California." (50 Cal.App.3d at p. 123, fn. 3.) In *Williams,* the plaintiff did not urge that the injury to his genital organs constituted a disfigurement within the meaning of Labor Code section 4660, apparently because such a claim would have defeated his contention that his injury was not covered by workers' compensation and supported an independent action. The court accordingly did not address the disfigurement question.

[7]*Renteria, supra,* 82 Cal.App.3d 833, does not fall in this category. In that case, racial discrimination appears to have been the motivating force behind the employer's misconduct. (*Id.* at p. 835.) Thus, the plaintiffs could have filed a civil suit based on a violation of fundamental public policy under principles set forth in *Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d 167.

infliction of emotional distress were properly sustained. As discussed above, there is no merit to plaintiff's assertion that purely emotional injuries lie outside the scope of the workers' compensation system. The mere failure to allege physical disability will not entitle the injured employee to a civil action. To this extent, the demurrers were properly sustained.

Plaintiff's contention that defendants' misconduct exceeded the normal risks of the employment relationship is another matter. Plaintiff has alleged that defendants engaged in a campaign of outrageous and harassing conduct, which included falsely claiming that plaintiff embezzled money from Continental and tried to sabotage the company's product; compelling plaintiff to sell his independent distribution company, ABA, and demanding possession of its books and records; and forcing plaintiff to sign a $100,000 promissory note for a debt owed to ABA under threat of retaliation if he refused. The circumstances of the discharge were further complicated by the fact that plaintiff apparently occupied a dual status in his relationship with defendants: as employee, and as independent distributor of Continental's product.

In summarily denying plaintiff's petition for writ of mandate, the Court of Appeal cited *Cole, supra,* 43 Cal.3d 148. In so doing, however, it is unclear whether the court was concerned with the *Renteria (supra,* 82 Cal.App.3d 833) issue or the nature of defendants' alleged misconduct. *Cole,* of course, addressed both issues. Its central holding that workers' compensation provides the exclusive remedy for torts that comprise "a normal part of the employment relationship" (43 Cal.3d at p. 160) has been discussed. However, as also noted, while *Cole* did not resolve the *Renteria* issue it acknowledged the "anomaly" which that decision had engendered. (*Id.* at p. 156.)

Whatever the Court of Appeal's intentions in issuing a summary denial, it plainly failed to render a decision on the merits. In light of the serious allegations set forth in plaintiff's complaint, however, we conclude that the issue is an important one which should be addressed in a written opinion by the Court of Appeal. Accordingly, we shall remand the matter to the Court of Appeal with directions to consider whether, in this regard, the demurrers to the causes of action for negligent and intentional infliction of emotional distress were properly sustained. (Cal. Rules of Court, rule 29.4(b).)

## 2. *Defamation*

In addition to his claims of intentional and negligent infliction of emotional distress, plaintiff asserted a cause of action for defamation based on defendants' allegedly false statements accusing plaintiff of embezzlement and other misconduct against the company. Plaintiff claimed that the statements were slanderous per se, that he was "shocked and humiliated" by their

publication, and that he suffered general damages to his reputation of $1 million.[8]

The trial court ruled that the defamation claim was barred by the exclusive remedy provisions of the Workers' Compensation Act; the Court of Appeal denied plaintiff's petition for writ of mandate, citing *Cole, supra,* 43 Cal.3d 148.

We have not heretofore ruled on the question whether defamation claims arising out of the course and scope of employment are barred by the exclusive remedy provisions of the Workers' Compensation Act.[9] We need not do so here. For even assuming, without deciding, that certain defamatory remarks in the employment context may be subject to workers' compensation, as we noted in the previous section the seriousness of the allegations in plaintiff's complaint and the hybrid nature of the relationship between plaintiff and defendants raise the further issue whether defendants' conduct was outside the scope and normal risks of employment. Therefore, on remand the Court of Appeal is directed to address these issues. (Cal. Rules of Court, rule 29.4(b).)

## DISPOSITION

Plaintiff's contention that *Renteria, supra,* 82 Cal.App.3d 833, compels reversal of the order of the superior court sustaining the demurrer to his causes of action for negligent and intentional infliction of emotional distress is without merit. Nevertheless, the judgment of the Court of Appeal summarily denying plaintiff's petition for writ of mandate for relief from that

---

[8]Although plaintiff's cause of action for defamation incorporated by reference all the earlier summarized facts, it was based more specifically on: (1) Cubaleski's statements that money was unaccountably "missing" from Continental, understood by those who heard the remarks as accusations that plaintiff had stolen the money (e.g., because plaintiff was the general manager authorized to sign checks for Continental), (2) accusations of taking an unauthorized pay increase, (3) accusations of sabotaging production of Continental's yogurt, (4) statements that ABA paid for fruit toppings with Continental's money, and (5) statements that plaintiff was "blackmailing" Cubaleski.

[9]A number of courts have apparently determined that the gravamen of an action for libel or slander is damage to "reputation," a "proprietary" as distinct from a physical or mental injury, and therefore have concluded that defamation does not lie within the purview of the workers' compensation law. (See, e.g., *Howland v. Balma* (1983) 143 Cal.App.3d 899 [192 Cal.Rptr. 286]; *Snead v. Harbaugh* (1991) 241 Va. 524 [404 S.E.2d 53, 55-56]; *Battista v. Chrysler Corp.* (Del. Super. Ct. 1982) 454 A.2d 286; *Gambrell v. Kan. City Chiefs Football Club* (Mo. Ct. App. 1978) 562 S.W.2d 163; *Foley v. Polaroid Corp.* (1980) 381 Mass. 545 [413 N.E.2d 711]; see also 2A Larson, Workmen's Compensation Laws (1990) § 68.33.) Other states have apparently concluded otherwise. (See, e.g., *Becker v. Automatic Garage Door Co.* (1990) 156 Wis.2d 409 [456 N.W.2d 888, 891-892]; *Thompson v. Maimonides Medical Center* (1982) 86 App.Div.2d 867 [447 N.Y.S.2d 308].) Although the issue is an interesting and unsettled one, as explained above it is not one which necessarily requires resolution here.

order is reversed, and the case is remanded to the Court of Appeal to consider on the merits the remaining issues identified herein.

Lucas, C. J., Mosk, J., Panelli, J., Kennard, J., Baxter, J., and George, J., concurred.