Filed 7/27/16  P. v. Underwood CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.111.5.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRYANT UNDERWOOD,<br><br>    Defendant and Appellant. | 2d Crim. No. B265400<br>(Super. Ct. No. NA098831)<br>(Los Angeles County) |

Bryant Underwood appeals his conviction by jury of first degree murder (Pen. Code, §§ 187, subd. (a); 189)[1] with personal use of a deadly weapon (§ 12022, subd. (b)(1)).  The trial court sentenced appellant to 25 years to life in state prison plus one year on the weapon enhancement.  He contends that the trial court erred in admitting evidence that he had an affair with the victim's girlfriend (Evid. Code, § 352), and in denying his *Faretta* request (*Faretta v. California* (1975) 422 U.S. 806) to represent himself at sentencing.  We affirm.

*Facts*

On April 8, 2014, appellant stabbed his cousin, Ahkeem Johnson, to death after Ahkeem told appellant's wife that appellant was having an affair with Ahkeem's girlfriend, Angelique Davillier.  Ahkeem learned about the affair two weeks earlier when

_____

[1]    All statutory references are to the Penal Code unless otherwise stated.

he saw text messages on Davillier's phone. When Ahkeem told appellant's wife, Shalani Broadhurst, about it, Broadhurst broke off her relationship with appellant.

Appellant denied the affair and told Broadhurst that he sold his phone to a coworker, Ryon Brown, who sent the text messages to Davillier. Appellant asked Brown to corroborate his claim. When Brown met with Broadhurst, Broadhurst called him a liar.

On the evening of April 7, 2014, Davillier went to work. Ahkeem's and Davillier's children (ages one and three) were asleep in the apartment. Sometime after 1:00 in the morning, a neighbor, Adrianne Patrick, heard loud booming noises coming from the apartment. It sounded like someone hitting the floor and walls. The noise stopped and someone ran down the kitchen stairs at the rear of the apartment. Earlier that evening, Patrick saw Ahkeem and appellant outside the apartment arguing.

A second neighbor, Jeffrey Adger, heard wrestling and a loud noise. Someone screamed "Call the police, I'm being stabbed" and "Help, call the police." Adger called 911 and saw appellant in a hooded sweatshirt standing at the apartment back stairs. Appellant was sizing up the chain link fence as if to climb it, then backed off.

Three Los Angeles Police officers responded to the 911 call. Officer Ernesto Perez saw blood on the back stairs leading up to Ahkeem's kitchen. When a second officer knocked on the apartment door, Officer Perez heard someone try to jump the chain link fence in the backyard.

Moments later, Officer Nelson Villoria saw appellant open a gate on the west sidewalk and heard the sound of metal objects dropping, Officer Villoria ordered appellant to put his hands up. Appellant was wearing a gray hooded sweatshirt and a glove on his right hand. The sweatshirt was soaked and dripping with blood. Appellant took the sweatshirt off and dropped it on the ground, along with the blood soaked glove. Another glove was inside the sweatshirt and blood was on appellant's pants and t-shirt. On the ground, next to appellant, officers found two blood-stained kitchen knives.

2

Officer Perez frisked appellant and found a knife handle, wet with blood, in appellant's front pants pocket. The knife handle matched a broken knife blade in the living room.

Ahkeem was in the apartment, lying face down in a large pool of blood. He had 28 stab wounds, including a four-inch deep wound to the neck. The stab wounds, some of which were four to seven inches deep, penetrated both lungs, the abdomen, stomach, and left flank area. Blood was on the living room walls and blood splatter was on the kitchen floor and cabinets. Officers found a bloody shoeprint in the apartment entryway and bloody shoeprints in the kitchen that were consistent with appellant's shoes.

At trial, appellant admitted that he had an affair with Davillier and that Ahkeem "was going around telling everybody." Appellant lied to Broadhurst about it. Appellant visited Akheem the night of the murder and said they heard a loud noise while smoking marijuana. Ahkeem rushed inside to check on his children.

Appellant said that he saw Ahkeem fight a six foot tall African-American male. Appellant tried to rescue him but the assailant knocked appellant into the wall and ran to the kitchen. Appellant provided Ahkeem first aid, grabbed a Swiss army knife, and chased the man. On cross-examination, appellant could not explain how Akheem was stabbed 28 times or why appellant did not see the assailant brandish a knife. Appellant was asked: "How did this guy manage to stab your cousin 28 times and yet you escaped from this altercation without a single stab wound?" Appellant could not explain.

*Sexual Affair With Ahkeem's Girlfriend*

Appellant claims that the trial court abused its discretion in admitting evidence of the affair. Appellant objected on relevancy grounds, arguing that it would be "overly cumbersome for the jury to listen [to] . . . all of these witnesses testify about some alleged affair. I don't think it has any impact on this case at all." The prosecution argued that the affair was highly relevant to show motive because Ahkeem revealed the affair and, in appellant's eyes, it ruined his marriage. Hours before the murder, appellant received a phone call from his daughter that "mommy has another boyfriend" and drove from Lake Elisnore to Long Beach to confront Ahkeem.

The trial court ruled that the sexual affair was relevant to show motive and impliedly found that the probative value of the evidence outweighed the potential for prejudice. (Evid. Code, § 352.) No abuse of discretion occurred. "'"[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]'" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168.) Although motive is not an element of a crime, it makes the crime understandable and renders the inferences regarding defendant's intent more reasonable. (*People v. Riccardi* (2012) 54 Cal.4th 758, 815.) [2]

Appellant argues the motive to kill was speculative because he may not have even cared that his wife ended the marriage, much less cared enough to want to kill Ahkeem. That was for the jury to decide. Ahkeem's disclosure of the affair clearly angered appellant. Appellant lied about the affair and tried to patch things up. Appellant told Broadhurst that a co-worker sent the text messages to Davillier and asked the co-worker to back him up. It did not work.

Appellant also lied to Ahkeem. Before the murder, he tried to fight Ahkeem for falsely accusing him of having an affair. Davillier told appellant to leave Ahkeem alone and testified that appellant "kept contacting him saying that he didn't do it, he just kept trying to lie." A week before the murder, Ahkeem confronted appellant about the text messages. Appellant lied about it and said he was trying to text another girl.

---

[2]   The jury received the following CALJIC 2.51 instruction: "Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty." The jury was also instructed that "[y]ou must not be influenced by sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." (CALJIC 1.00)

4

The night of the murder, appellant received a phone call from his daughter that "mommy [Broadhurst] has another boyfriend." Appellant drove from Lake Elsinore to Long Beach to confront Ahkeem. It was late at night and Davillier was at work. The neighbor (Adrianne Patrick) heard them arguing. Ahkeem was upset and said, "What are you trying to do? My kids are in the house asleep."

Based on the extramarital affair, Ahkeem's disclosure of the affair, appellant's marital separation, the daughter's phone call, and the argument outside Ahkeem's apartment, the jury could reasonably infer that the affair was linked to the murder. "'Evidence having a direct tendency, in view of the surrounding circumstances, to prove motive on the part of a person to commit a homicide, and thus to solve a doubt either as to the identity of the slayer, the degree of the offense, . . . or the justification or excusability of his act, is admissible, however discreditably it may reflect upon the defendant, and even where it may show him guilty of other crimes.' [Citations.]" (1 Witkin, Cal. Evidence (5th ed. 2012) Circumstantial Evidence, § 123, p. 530.)

Testimony about the affair and how it led to appellant's marital breakup was highly probative of motive and circumstantial evidence of premeditation and deliberation. (*People v. Perez* (1992) 2 Cal.4th 1117, 1125 [evidence of planning, motive, and manner of killing can support a finding of premeditation and deliberation]; *People v. Cage* (2015) 62 Cal.4th 256, 274.) "It further supported the evidence of [appellant's] identity as the killer, provided a fuller explanation for the killing, and supplied important indirect evidence of [appellant's] intent, which the jury also reasonably could have considered on the issue of premeditation and deliberation. Moreover, the evidence was not unduly prejudicial. (Evid. Code, § 352, subd. (b).)" (*Id.*, at p. 275.) It took no leap in logic for the jury to draw the inference that appellant was mad about Ahkeem revealing his infidelity. When appellant learned that his wife was seeing another man and had no intention of reconciling, it fueled the need for revenge and the late night visit.

Appellant argues that the extramarital affair was inflammatory and denied him a fair trial. Testimony about the affair was far less inflammatory than the circumstances of the crime: appellant armed himself with a knife and gloves, entered the

5

apartment, and stabbed Ahkeem 28 times while his children (ages one and three) slept in the next room. The trial court concluded that the affair was relevant and admissible to show motive. (Evid. Code, § 352; see e.g., *People v. Riccardi, supra*, 54 Cal.4th at p. 815-816.) We cannot say that the ruling was so irrational or arbitrary that no reasonable person could agree with it. (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

Appellant argues that testimony about the affair violated his due process right to a fair trial. Appellant objected on relevancy grounds but did not object on due process grounds. (See *People v. Catlin* (2001) 26 Cal.4th 81, 122 [contention that other-crimes evidence violated constitutional right to a fair trial was waived because it was not raised below]; *People v. Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [objection on basis of Evid. Code, § 352 did not preserve constitutional objection].) If appellant believed "that the trial court should engage in some sort of due process analysis that was different from the Evidence Code section 352 analysis, he could have, and should have made this clear as part of his trial objection. He did not do so. Accordingly he may not argue on appeal that due process required exclusion of the evidence for reasons other than those articulated in his Evidence Code section 352 argument." (*People v. Partida* (2005) 37 Cal.4th 428, 435.) It is settled that the application of ordinary rules of evidence does not violate a defendant's constitutional right to present a defense or right to a fair trial. (*People v. Dement* (2011) 53 Cal.4th 1, 52; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)

*Faretta Request*

Appellant contends that the trial court erred in denying his *Faretta* request (*Faretta v. California, supra*, 422 U.S. 806) to represent himself at sentencing. Just before the case was called for sentencing, appellant refused to come out of lock up and said "Not my attorney, not my attorney," "I don't want her [Attorney Reed-McLean] to represent me."

The trial court conducted a *Marsden* hearing and advised appellant "[y]ou don't have the option to fire her and, yes, I'm going to keep her on the case." Appellant said "She's not representing me." The trial court responded "yes, she is" and "I'm not

6

getting rid of her now. If you want to represent yourself . . . , that's fine, but I'm not going to continue the proceeding for that purpose. . . . [W]e'll sentence you today. If you want to do that by yourself, that's fine, but if you don't, then Ms. Reed-McLean is going to remain on the case." Appellant said "I'll do it by myself" and was given a *Faretta* waiver form.

Appellant complained "I might be tricked into signing some bullshit," and refused to fill out or sign the waiver form. Appellant said that he did not understand any of it. The trial court offered to go through each line of the waiver form and explained that if appellant wanted to represent himself he would have to "handle the issue of sentencing without a lawyer. You don't understand that?" Appellant did not respond.

"THE COURT: You want me to do this orally Mr. Underwood? Go down them one by one? Would that be beneficial? Or do you understand it now?"

Appellant did not respond and conferred with a deputy public defender. After a recess, the deputy public defender advised the court that appellant was not willing to fill out the *Faretta* form but was ready to proceed with sentencing. Reprimanding counsel, appellant protested: "I didn't tell you shit like this." The trial court denied the *Faretta* request and explained why: "[I]f you're not going to fill out the paperwork, if you're not going to answer the questions, if you're telling me you don't understand, I'm going to find you're not able or qualified to represent yourself and we're going to proceed with the sentencing. Ms. Reed-Mclean [trial counsel] is going to be your lawyer . . . ."

During the sentencing hearing, appellant disrupted the proceedings, cursed the mother of the victim's children (Davillier), and denied that he committed the murder. Appellant was asked if he wanted to address the court with respect to the sentence to be imposed. Appellant shook his head indicating no.

Although a criminal defendant has a Sixth Amendment right to represent himself, the "courts must draw every inference against supposing that the defendant wishes to waive the right to counsel." (*People v. Marshall* (1997) 15 Cal.4th 1, 23.) A *Faretta* request for self-representation must be timely, unequivocal, and knowingly and intelligently made. (*People v. Welch* (1999) 20 Cal.4th 701, 729.) "The court may deny

7

a request for self-representation that is "equivocal, made in passing anger or frustration, or intended to delay or disrupt the proceedings. [Citation.]" (*People v. Butler* (2009) 47 Cal.4th 814, 825.)

All of those factors were at play here. Because the request was untimely, appellant's right to self-representation was not absolute but subject to the trial court's discretion. (*People v. Doolin* (2009) 45 Cal.4th 390, 455, fn. 39; *People v. Bradford* (1997) 15 Cal.4th 1229, 1365.) Frustrated about the *Marsden* ruling, appellant tried to manipulate the proceeding by switching between requests for new counsel and self-representation, and had no genuine desire to represent himself. (See e.g., *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1001-1002; *People v. Scott* (2001) 91 Cal.App.4th 1197, 1205.) After independent counsel conferred with appellant and advised the court that appellant was ready to proceed with sentencing, appellant denied it. Appellant was twice asked if he wanted to represent himself but did not respond.

Appellant was playing "the *Faretta* game" by juggling his right of self-representation with the right to counsel to disrupt the proceeding. (See e.g., *People v. Williams* (1990) 220 Cal.App.3d 1165, 1170.) No reasonable court would find that appellant timely, unequivocally, knowingly, and intelligently invoked his right to self-representation. As *Faretta* itself made clear, a constitutional right of self-representation "is not a license to abuse the dignity of the courtroom." (*Faretta v. California, supra*, 422 U.S. at p. 834, fn. 46.)

*Conclusion*

The judgment is affirmed.

NOT TO BE PUBLISHED.

YEGAN, Acting P. J.

We concur:

PERREN, J.

TANGEMAN, J.

8

Gary J. Ferrari, Judge

Superior Court County of Los Angeles

_____

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, Zee Rodriguez, Deputy Attorney General, for Plaintiff and Respondent.