Filed 3/26/13  Ramos v. Ralphs Grocery CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GUSTAVO A. RAMOS, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> RALPHS GROCERY COMPANY, INC. et al., <br><br> Defendants and Respondents. | D060196 <br><br><br> (Super. Ct. No. 37-2010-00088103-CU-OE-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, William S. Dato, Judge.  Affirmed.

Appellant Gustavo A. Ramos was employed by respondent Ralphs Grocery Company, Inc. (Ralphs), from 1989 to 1990 and from June 1996 until he was terminated in March 2009 for twice calling a coworker a "fucking racist bitch."  Ramos sued Ralphs and two of his former supervisors, respondent John Meza and Jennifer Welker, asserting causes of action for harassment (but *not* wrongful termination) based on age and national

origin in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code,[1] § 12900 et seq.) and for intentional and negligent infliction of emotional distress.[2]

On appeal, Ramos contends the trial court erred in granting summary judgment in favor of Ralphs and Meza because (1) he raised material disputed facts in support of his age harassment claim and because the court erred in applying the law to that claim, and (2) his emotional distress claims were not barred by the exclusivity provisions of the workers' compensation law. As we explain, we disagree with both contentions and affirm the judgment.

## BACKGROUND

The following facts are undisputed:

Ramos held the position of courtesy clerk or "bagger" at the Ralphs store in Del Mar, California, from 1996 until February 2006, when he was promoted to merchandise clerk. During his employment, Ramos was a member of the United Food and Commercial Workers Union, Local 135. Ramos was again promoted in December 2006 to the position of food clerk, which is the position he held at the time of his termination in March 2009. When Ramos received each promotion, he was told it was to increase his salary, but that he was to remain a bagger because of his popularity with customers.

In late 2008 and early 2009, Ralphs faced a company-wide issue with union

---

[1]     All statutory references are to the Government Code unless otherwise indicated.

[2]     Ramos does not challenge on appeal the judgment in favor of Welker or the adjudication of his race/national origin claim in respondents' favor.

2

employees working out of their job classifications. Specifically, many union employees were performing job duties in job categories that paid less than their assigned job classification. That is, instead of receiving the pay rate for the job classifications for which they were performing duties, many union employees were receiving the pay rate—which was higher—for their job classifications, but they were not performing the duties of their job classifications.

To address this issue, Ralphs instructed all district managers and store directors to correct the issue of job "misclassifications." Ralphs district manager Wayne Colwell was responsible for "District 11," which included the Del Mar store, and frequently discussed the misclassification issue at district meetings. In early 2009, District 11 began correcting the misclassification problem by reassigning misclassified employees to appropriate departments and positions to match their actual job classification.

Ramos was among the employees who were working out of their job classifications. In February and March 2009, John Meza took over as store director of the Del Mar store and realigned about 10 employees, including Ramos, into their proper job classifications. Prior to the realignment, Ramos was classified and paid as a food clerk, but as noted, *ante*, was performing the duties of a courtesy clerk. Meza moved Ramos from the "front of the store" to the produce department. In the produce department, Ramos would be performing job duties appropriate for someone classified as a food clerk.

Ramos told Steven Bodle, the comanager of the Del Mar store, that he did not

want to be assigned to work in produce. Ramos subsequently contacted district manager Colwell about the reassignment. Colwell in turn advised Meza to keep Ramos at the front of the store. Thus, Ramos did not move to produce and continued to work as a courtesy clerk, even though he was classified and paid as a food clerk.

As a courtesy clerk, Ramos was responsible for greeting customers; packing customers' groceries; helping customers carry groceries to their cars; maintaining the cleanliness, orderliness and general appearance of the store and checkstand area; retrieving shopping carts from the parking lot and removing trash from the carts; performing miscellaneous cleanup duties in the store and in the parking lot; and breaking down, removing and disposing of cardboard boxes, among other duties.

Gabe Navarette was the store director of the Del Mar Ralphs before Meza. Navarette frequently assigned Ramos general cleaning duties at the store, including a recurring assignment every Wednesday to clean the floors, pull empty pallets and empty cardboard boxes from the store. Navarette also had Ramos clean the floors, the storage room and the break room of the store. In addition, comanager Bodle also assigned Ramos to mop, clean the frozen foods glass doors and wipe the chrome around the milk stand.

Once Meza became the store director, he instructed various courtesy clerks to clean, because that was one of the duties of a courtesy clerk. Meza instructed Ramos and other courtesy clerks to clean the frozen foods glass doors, both inside and outside, and the bottom metal bumper alongside the freezers, among other cleaning duties. Meza also

4

instructed Ramos to clean the outside of the store's windows, to pick up trash and debris that accumulated behind the store, and to clean the baseboards and ceiling panels inside the store.

In mid-March 2009, Ramos became involved in a verbal dispute with the store's sales manager Anita Cerniglia. While Cerniglia was at a checkstand ringing up the groceries of a customer who frequently shopped at the store,[3] Ramos came over and told another bagger who was already helping with the customer, "I got this one" or words to that effect, and began unloading the customer's cart and bagging the customer's groceries. Cerniglia directed Ramos to leave, but Ramos refused. After Cerniglia repeated her demands to Ramos, Ramos told Cerniglia at least twice in a hushed tone, "leave me alone, fucking racist bitch."

The following day, Meza reported the incident to Ralphs's labor relations representative Kirk Reynolds. Reynolds suspended Ramos and directed Meza to obtain witness statements about the incident. After reviewing those statements, including the statement by Cerniglia and by the other courtesy clerk who witnessed the incident, Reynolds recommended that Ramos be terminated. Ramos was subsequently terminated from employment at Ralphs for (1) violation of company rules, (2) foul/abusive language to coworkers, (3) inappropriate behavior/unprofessional conduct and (4) causing a disturbance.

Ramos subsequently filed a grievance statement with his union seeking

---

[3]    Ramos testified that customers often tipped him when he took groceries to their cars and during the holiday season.

reinstatement of employment and back pay.  In this multiple-page statement, Ramos alleged that Meza created a hostile work environment because he was upset that Ramos earned higher wages than the other courtesy clerks; that Meza assigned him difficult manual labor tasks and then criticized his performance of those tasks in an effort to "demoralize" Ramos; and that Cerniglia purposely provoked the confrontation with Ramos, which led to his swearing at her, because she too had become hostile toward Ramos after he had obtained Colwell's assistance to remain in the front of the store rather than be transferred to produce.

Defendants subsequently moved for summary judgment/adjudication.[4]  As relevant to the issues in this proceeding, the trial court granted summary judgment/adjudication in favor of respondents as follows:

"Plaintiff Gustavo Ramos is 55 years old and a citizen of Venezuela.  (Ramos Decl. ¶ 1.)  He was initially employed with Ralphs from 1989 to 1990.  (Ramos Decl. ¶ 2.)  In 1996 he resumed his employment with Ralphs, and he continued to work there until his termination on March 20, 2009.  (UMF 1.)  From at least 1997, plaintiff worked at the Del Mar store, where he performed Courtesy Clerk duties.  (UMFs 2, 4.)  Such duties include:  (1) greeting customers, (2) packing customers' groceries and helping them to their car, (3) maintaining the cleanliness and orderliness of the checkstand area, (4) performing miscellaneous cleanup duties in the store and parking lot, (5) breaking down and disposing of cardboard boxes, (6) handling cleanups throughout the store, and

---

4       See footnote 2, *ante*.

(7) retrieving carts from the parking lot and removing trash from them. (UMF 5.) The clerks scheduled to work in the mornings are often asked to generally clean up the store. (UMF 6.)

"Plaintiff loved his job and, in particular, the personal relationships he developed with customers. (Ramos Decl. ¶ 9; Def. NOL, Patajo Decl., Ex. 1, p. 171.) In February 2006, he was promoted from Courtesy Clerk to General Merchandise Clerk, with an attendant increase in pay. (UMFs 24-25.) In December 2006, plaintiff was promoted to Food Clerk, which resulted in another increase in pay. (UMFs 26-27.) He was told that he was given these promotions to increase his salary, but that he would 'remain a bagger' due to his outstanding customer service skills. (Ramos Decl. ¶ 3.)

"John Meza assumed the role of Store Director in February 2009. (Meza Decl. ¶ 2.) Plaintiff claims that his relationship with Meza was strained from the beginning because Meza 'made it abundantly clear that he felt that I was paid too much money.' (Ramos Decl. ¶ 8.) According to plaintiff, Meza told him 'I can get two for you. I can get two [baggers] for the price for what we pay you.' (Pltf. NOL, Ex. 3, p. 223.) Plaintiff heard from others that Meza had complained about this issue at a meeting of the district store directors, but that District Manager Wayne Colwell told Meza to leave him alone because he 'was a great favorite with the customers.' (Ramos, Decl. ¶ 8.)

"Meza was unfriendly to plaintiff, belittled him in front of others, and assigned him difficult and unusual tasks to prevent him from having customer contact. (Ramos Decl. ¶¶ 10-11.) Meza ordered plaintiff to clean the outside of all of the store windows, a

7

task he did not believe any other store employee had ever done. (Ramos Decl. ¶ 11.) While he was cleaning, Meza frequently came by, made comments about how much money he made and what a lousy job he was doing, and ordered him to rewash [the] windows. (Ramos Decl. ¶ 11.)

"On another occasion, Meza ordered plaintiff to wash baseboards, which he did not believe any other employees had ever done. (Ramos Decl. ¶ 12.) Plaintiff states that it 'was the most arduous and difficult task' he had ever done while at Ralphs, as the job took 3 to 4 days to complete and required him to either lie on the floor or work on his knees, without anything to prevent him from inhaling the dirt and dust from the floor and without any pads to protect his knees. (Ramos Decl. ¶ 12.) Again, Meza frequently came out to observe his work, criticize him, and order him to redo certain baseboards. (Ramos Decl. ¶ 12.)

"Around plaintiff's birthday, Meza ordered him to the rear of the store to perform yet another job plaintiff did not believe anyone else had been ordered to do—cleaning up a large debris pile consisting of items such as broken chairs, old cash registers, broken glass and old shopping carts. (Ramos Decl. ¶ 13.) The pile was covered in rust, mold and dirt. (Ramos Decl. ¶ 13.) Plaintiff believes that Meza ordered him to the rear of the store so that he would not have contact with customers who would normally wish him well on his birthday. (Ramos Decl. ¶ 13.) Meza also ordered plaintiff to clean the ceiling panels, which was an impossible task. (Ramos Decl. ¶ 14.) Meza again criticized plaintiff but, ultimately realizing the futility of the work, ordered new panels. (Ramos

8

Decl. ¶ 14.)

"Meanwhile, Ralphs was addressing a company-wide issue with union employees working out of their job classification, such that they were performing job duties in job categories that paid less than their assigned classifications. (Colwell Decl. ¶ 4.) Ralphs instructed all District Managers and Store Directors to correct this issue. (Colwell Decl. ¶ 5.) Ramos was one of the employees working out of his job classification, because he continued to perform Courtesy Clerk duties despite the fact that he was classified and paid as a Food Clerk. (UMFs 23, 28; Meza Decl. ¶ 8.)

"Thus, after Meza took over he realigned several employees, including plaintiff, so that they would be working in their proper job classifications. (UMF 21; Meza Decl. ¶¶ 2, 7-8.) Meza told plaintiff he would be transferred to the Produce department where he would perform the duties of a Food Clerk. (Meza Decl. ¶ 8.) Plaintiff believed that Meza's intent was to isolate him from the customers, and the only reason given for the change was that 'other baggers make less money and it is not fair to them.' (Ramos Decl., ¶ 16.) Plaintiff was devastated by this news and offered to take a pay cut to remain in the bagger position. (Ramos Decl. ¶ 16.) Meza refused, saying 'I wouldn't look good with customers if I cut your pay.' (Ramos Decl. ¶ 16.)

"Two days later, plaintiff discussed the issue with Steve Bodle, co-manager of the store. (Ramos Decl. ¶ 18; Bodle Decl. ¶ 2.) Bodle told plaintiff he didn't want him to transfer to Produce either, and suggested he call Colwell. (Ramos Decl. ¶ 18.) Colwell also agreed with plaintiff and told Meza to keep him at the front of the store, which Meza

9

did.  (Ramos Decl. ¶ 18; Colwell Decl. ¶¶ 8-9; UMF 33.)  According to plaintiff, he then began to receive taunts, especially from Front End Manager Jennifer Welker and Anita Cerniglia.  (Ramos Decl. ¶ 19.)  Plaintiff theorizes that since Meza had been rebuffed by Colwell, he had devised another plan to get rid of him—disclosing plaintiff's salary information to other employees, who then became resentful.  (Ramos Decl. ¶ 19.)

"Events reached a head on March 15, 2009, when plaintiff became involved in a verbal dispute with Cerniglia, a sales manager at the time.  (UMF 34.)  Plaintiff had come over to Cerniglia's checkstand to assist a customer that he knew well, Kim Admire, unload her groceries.  (UMF 35; Ramos Decl. ¶ 20.)  Ramos was concerned and wanted to help because Admire had her three young children with her and, while she was trying to unload the groceries, her baby began crying.  (Ramos Decl. ¶ 21.)  Cerniglia repeatedly told plaintiff his help was not needed and asked him to leave.  (UMFs 36-37; Ramos Decl. ¶ 21.)  Plaintiff and Admire both state that Cerniglia was very hostile and agitated.  (Ramos Decl. ¶ 21; Admire Decl. ¶ 10.)  Exasperated, plaintiff twice told Cerniglia 'leave me alone, fucking racist bitch.'  (Ramos Decl. ¶ 21.)  According to plaintiff, he used a low tone so as not to embarrass Admire.  (Ramos Decl. ¶ 21.)

"Meza was not at work the day of the incident, but when he learned about it he contacted Ralphs Labor Relations.  (Meza Decl. ¶ 10.)  Based on the incident, Senior Labor Relations Representative Kirk Reynolds decided to suspend Ramos and later recommended that he be terminated for: (1) violation of company rules; (2) foul/abusive language to co-workers; (3) inappropriate behavior/unprofessional conduct; and (4)

10

causing a disturbance. (Reynolds Decl. ¶¶ 3-4.) Plaintiff was terminated on March 20, 2009, and subsequently filed this action. He asserts four claims: intentional infliction of emotion distress (1st cause of action); negligent infliction of emotional distress (2nd cause of action); harassment based on age under FEHA (3rd cause of action); [and] harassment based on national origin (4th cause of action).

"*Harassment based on age (Gov. Code, § 12940, subd. (j)(1))*:

"In his third cause of action, plaintiff alleges he was harassed based on his age. (FAC ¶¶ 61-72.) Defendants assert this claim has no merit because plaintiff cannot show that any of the alleged mistreatment was based on his age. Plaintiff concedes that nobody ever mentioned his age during any of the alleged harassing incidents, and that he has never been told by anyone, or read any documents, indicating that he was subjected to harassment because of his age. (UMFs 390-392.) Rather, plaintiff claims that Meza harassed him because of how much plaintiff was paid. (UMFs 386-388.) Plaintiff asserts that, in effect, this constituted harassment based on age because he made more money than the younger employees who had not worked at Ralph's as long as he had. (Pltf. Opp., pp 13-14.) In early 2009, none of the other baggers were even near plaintiff's age, and plaintiff guessed that the average age of the other baggers was 16 to 21. (Pltf. NOL, Ex. 3, p. 223.)

"Under FEHA, disparate treatment or termination based on salary or wages may constitute age discrimination 'if use of the criterion adversely impacts older workers *as a group* . . . .' (Gov. Code, § 12941 [emphasis added].) Focusing on the latter phrase, the

11

Supreme Court in *Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317 responded to a plaintiff's claim that his employer had engaged in discriminatory efforts to reduce salaries by releasing higher-paid older workers. The court emphasized that the employer's decision to select one junior employee for a junior position did not 'have a disparate impact on older workers *as a group*.' (*Id.* at p. 390, fn. 29.)

"While there is evidence that Meza may have harassed plaintiff based on his wage rate, plaintiff has failed to introduce any evidence that Meza engaged in this type of conduct toward higher-paid and older workers *as a group*. The Court recognizes that in this case there may not have been any older baggers. However, that would not preclude plaintiff from establishing, for example, that Ralphs or Meza were working to get rid of older and higher-paid employees in general. No such evidence was presented. Plaintiff has thus failed to create a triable issue of fact that Meza's conduct was the result of age discrimination. [¶] . . . [¶]

"*Negligent and Intentional infliction of emotional distress*:

"Defendants contend that plaintiff's two emotional distress claims are barred by the exclusive remedy provision of the worker's compensation law. (Lab. Code, § 3600 *et seq.*) Generally, emotional distress claims are barred by the exclusivity rule unless the defendant's conduct falls outside the normal part of the employment relationship or violates a fundamental public policy statute. (See *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 25 ['The kinds of conduct at issue (e.g., discipline or criticism) are a normal part of the employment relationship. Even if such conduct may be characterized as intentional,

12

unfair or outrageous, it is nevertheless covered by the workers' compensation exclusivity provisions']; *Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 160 ['when the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances, an employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code by charactering the employer's decisions as manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance resulting in disability']; *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 902; *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 812.)  This rule applies whether the injuries were caused by the wrongful termination of employment, or the acts leading up to the termination.  (*Shoemaker*, *supra*, 52 Cal.3d at p. 20.)

"Plaintiff argues that these claims are not barred because they arise from unlawful discrimination and harassment, and that '[t]he actions of Meza and Welker in fabricating reasons to dismiss the plaintiff were clearly outside the "employment relationship" and the "compensation bargain."'  (Pltf. Opp., pp. 8-9.)  However, as set forth above, plaintiff has failed to establish that he was discriminated against or harassed based on his age . . . .  Moreover, there is no evidence that Welker played any role in deciding whether to terminate plaintiff and, although Meza did participate to some extent in the termination, the recommendation was made by Reynolds.

"Finally, even if Meza's conduct relative to the cleaning tasks he assigned plaintiff

13

could be considered unfair or outrageous, it does not fall outside of the employment relationship so as to bring plaintiff's claims outside of the exclusivity rule. (*Cole*, *supra*, 43 Cal.3d at pp. 160-161.) There is no distinguishable difference between this case and *Cole*, where the plaintiff alleged that the assistant chief harassed him in a number of ways, including assigning plaintiff to perform 'humiliating and menial duties.' (*Id.* at pp. 152-153.) The California Supreme Court held that plaintiff's emotional distress claims were barred by the worker's compensation exclusivity rule: 'the allegations in the instant case as to the *conduct* of the employer and the assistant chief reflect matters which can be expected to occur with substantial frequency in the working environment. Some harassment by superiors when there is a clash of personality or values is not uncommon.' (*Id.* at p. 161.)

"*Beagle v. Rite Aid Corp.* (N.D. Cal. Sept. 23, 2009, No. C 08-1517 PJH) 2009 WL 3112098 and *Garcia-Barajas v. Nestle Purina Petcare Co.* (E.D. Cal. July 15, 2009) 2009 WL 2151850, neither of which are binding on this Court, are inapposite because the emotional distress claims involved alleged violations of fundamental public policy. In *Beagle*, the district court concluded that to the extent plaintiff's emotional distress claims were premised on sexual harassment, or the failure of her employer to take action to prevent the harassment, 'those claims cannot be considered to be based on the normal employment relationship' and therefore would not be barred by the exclusivity rule. (*Beagle*, *supra*, 2009 WL at p. *13.) Similarly, in *Garcia-Barajas* the plaintiff premised his emotional distress claim on the employer intentionally exposing him to serious known

14

health hazards and then terminating him when he exercised his statutory right to complain. (*Garcia-Baraja*, *supra*, 2009 WL at p. *8.) Here, by contrast, Ramos has not introduced any evidence tending to show that Meza's harassment violated a fundamental public policy or statute."

## DISCUSSION

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.] Under California's traditional rules, we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law. [Citations.]" (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 334-335.)

A. *Age Harassment Claim*

The FEHA is limited to the categories specifically enumerated in the statute. (See *Rojo v. Kliger* (1990) 52 Cal.3d 65, 79-80 ["FEHA bars discrimination only on the grounds specified"].) As pertinent here, the FEHA makes it "an unlawful employment practice" "[f]or an employer . . . , *because of* . . . age . . . , to harass an employee . . . ." (§ 12940, subd. (j)(1), italics added.)

Respondents contend the trial court correctly granted summary

15

judgment/adjudication of Ramos's claim that he was harassed "because of" his age, in violation of section 12940, subdivision (j)(1), inasmuch as Ramos admitted that nobody in this lawsuit ever mentioned his age during any of the alleged harassing incidents and he was never told by anyone, or read any documents, indicating that he was subjected to harassment "because of" his age. !(CT 682)! As such, respondents contend the burden shifted to Ramos to establish by admissible evidence a triable issue of fact that he was in fact harassed "because of" his age.

Ramos argues he proffered sufficient evidence establishing a causal link between the alleged harassment and his age, and thus is entitled to a trial on his claim. Specifically, he argues that the evidence of his long tenure at Ralphs supports the inference he was harassed "because of" his age, inasmuch as he was much older than the other courtesy clerks and earned higher wages than them as a result of his longstanding employment at Ralphs, which spanned more than a decade and included at least two promotions.

Although there is evidence that Meza *may* have harassed Ramos, there is no evidence in the record that Ramos was harassed "because of" his age. (§ 12940, subd. (j)(1); see also *Hart v. National Mortgage & Land Co.* (1987) 189 Cal.App.3d 1420, 1426 [concluding section 12940, subdivision (b) did not apply because plaintiff failed to show he was harassed *because of* plaintiff's sex].) Indeed, Ramos cannot point to any evidence establishing that respondents took any actions against him as a result of his age. The comments by Meza that Ramos made "too much money," that the other

16

courtesy clerks were upset at the amount Ramos was paid by Ralphs to do the same job and that based on what Ramos was paid, Meza allegedly could "get two baggers" for the Del Mar store are age neutral, as respondents correctly note. In any event, harassment for being a higher paid employee than other similarly situated employees (i.e., "wage-rate" harassment—a term used by the trial court here) is not a protracted class or category recognized by the FEHA. (See *Rojo v. Kliger*, *supra*, 52 Cal.3d at pp. 79-80.)

Moreover, we reject Ramos's contention that the trial court improperly applied the law in granting summary judgment/adjudication of his age harassment claim. Ramos contends the trial court improperly interpreted section 12941[5] when it found Ramos must be an established member of a "group" for his age harassment claim to proceed. Because Ramos could not establish that Meza engaged in discriminatory behavior against other older employees at Ralphs, according to Ramos his age harassment claim could not go forward.

The trial court in its ruling, *ante*, did not require Ramos to submit evidence of age-based harassment against other older employees of Ralphs in order to create a disputed material fact to defeat summary judgment/adjudication of this claim. Rather, the trial court noted that because of the lack of evidence proffered by Ramos that respondents' alleged actions were due to his age, Ramos could not establish a disputed material fact

---

[5]     Section 12941 provides in part: "The Legislature declares its intent that the use of salary as the basis for differentiating between employees when terminating employment may be found to constitute age discrimination if use of that criterion adversely impacts older workers *as a group*, and further declares its intent that the disparate impact theory of proof may be used in claims of age discrimination." (Italics added.)

17

merely by introducing evidence of Meza's alleged statements about Ramos's salary *unless*—as section 12941 states—Ramos also offered evidence of salary discrimination against other similarly situated (i.e., a "group") older employees. (See § 12941.) There is no such evidence in the record.

We thus independently conclude the trial court properly granted summary judgment/adjudication of Ramos's age harassment claim because respondents have demonstrated that under no hypothesis is there a disputed material fact that requires the process of trial on this claim. (*Guz v. Bechtel National Inc.*, *supra*, 24 Cal.4th at pp. 334-335.)[6]

B. *Emotional Distress Claims*

Ramos next contends the trial court erred when it found his emotional distress claims were barred by the exclusive remedy provisions of the Workers' Compensation Act.

The workers' compensation statutes, set forth in Labor Code section 3200 et seq., provide the full remedy, "in lieu of any other liability whatsoever," for injuries "arising out of and in the course of . . . employment." (Lab. Code, § 3600, subd. (a).) Our Supreme Court has held that "claims for intentional or negligent infliction of emotional distress are preempted by the exclusivity provisions of the workers' compensation law . . . ." (*Livitsanos v. Superior Court* (1992) 2 Cal.4th 744, 747; see also *Shoemaker v.*

---

[6] In light of our decision, we deem it unnecessary to decide respondents' alternative contention that the alleged conduct by Meza was not severe enough or sufficiently pervasive to a reasonable person to create a hostile work environment and constitute harassment.

*Myers* (1990) 52 Cal.3d 1, 15.)

Such claims are preempted even if they result from allegedly wrongful termination (*Shoemaker v. Myers*, *supra*, 52 Cal.3d at p. 25), and an employee "may not avoid the exclusive remedy provisions of the Labor Code by characterizing the employer's decisions as manifestly unfair, outrageous, harassment or intended to cause emotional disturbance resulting in disability." (*Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 160-161 [allegations of intentional employer misconduct are insufficient to avoid the exclusivity provisions of the workers' compensation system, inasmuch as an "employer's supervisory conduct is inherently 'intentional'"].)

However, in certain "'exceptional circumstances'" a separate civil action may lie where the employee's injury results from employer conduct that is outside the normal risk of employment. (See *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 812.) In making this determination, the key issue is whether the alleged acts themselves, bereft of claimed motives, "'can ever be viewed as a normal aspect of the employer relationship' . . . ." (*Id.* at p. 822.)

Here, the record shows Ramos's emotional distress claims were based on his purported transfer to the produce department and his change of hours in order to limit allegedly Ramos's interaction with customers, which interaction gave Ramos the most job satisfaction; Meza's repeated criticisms of Ramos's work performance; Meza's comments that Ramos was overpaid to work as a bagger; and Meza's directives to Ramos to perform allegedly menial and difficult cleaning tasks that were "outside [Ramos's] job description

19

and experience."

We therefore conclude that Ramos's emotional distress claims are preempted as they are premised on alleged acts of harassment that fall squarely within the normal risk of employment. (See *Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701, 717 [an employee's claims are barred under the exclusive remedy provisions of the workers' compensation law if the claims are based on an employer's intentional acts that are "a 'normal' part of the employment relationship"]; see also *Cole v. Fair Oaks Protection Dist.*, *supra*, 43 Cal.3d at pp. 160-161 [allegedly "outrageous" acts by employer were normal risks and conditions of employment and thus plaintiff could not maintain his emotional distress claim even with evidence that employer: intentionally harassed plaintiff in union negotiations; demanded that plaintiff report to a meeting for performance evaluation and possible disciplinary action and refused to allow plaintiff to attend a funeral; took punitive action against plaintiff for his union activities; assigned plaintiff "'humiliating and menial duties'" once he returned to work after being out on medical leave due to high blood pressure from job stress; and placed plaintiff in the entry-level position of dispatcher after employer publicly stripped plaintiff of his fire fighter's captain badge, claiming plaintiff was dishonest].)

Ramos also contends his emotional distress claims are outside the exclusivity provisions because he was subjected to age harassment in violation of section 12940, subdivision (j)(1). (See, e.g., *Murray v. Oceanside Unified School Dist.* (2000) 79 Cal.App.4th 1338, 1363 [emotional distress claims based on an employer's harassment or

20

discrimination are not barred by the exclusivity provisions of workers' compensation laws].)

Ramos's contention fails because as we discussed *ante*, he has no basis for an FEHA claim (see *Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1382 [plaintiff's emotional distress claims failed to the extent they were tethered to an unestablished sex discrimination claim]) and has proffered no evidence to show the motive behind his employer's alleged acts of harassment violated a "'fundamental policy of this state' [citation]." (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund*, *supra*, 24 Cal.4th at p. 812.) Therefore, we independently conclude the trial court properly granted summary judgment/adjudication of Ramos's emotional distress claims.

## DISPOSITION

The judgment is affirmed. Respondents Ralphs and Meza are awarded their costs on appeal.

BENKE, Acting P. J.

WE CONCUR:

McINTYRE, J.

AARON, J.

21